1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

IDS PROPERTY CASUALTY
INSURANCE COMPANY, et al.,

        Plaintiffs,

   v.

CRAIG PICKENS, et al.,

        Defendants.

CASE NO. C15-5125 BHS

ORDER GRANTING
PLAINTIFFS' MOTIONS FOR
SUMMARY JUDGMENT AND
DENYING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT

This matter comes before the Court on the parties' cross-motions for summary

judgment (Dkts. 29, 30, 33).  The Court has considered the pleadings filed in support of

and in opposition to the motions and the remainder of the file and hereby rules as follows:

## I. PROCEDURAL HISTORY

On March 2, 2015, Plaintiff IDS Property Casualty Insurance Company ("IDS")

filed a declaratory judgment action under 28 U.S.C. §§ 2201 and 2202 against

Defendants Craig and Janelle Pickens ("the Pickens") and their minor son, CP.  Dkt. 1

("Comp.").  IDS seeks a declaration regarding the amount of underinsured motorist

("UIM") coverage and personal injury protection ("PIP") coverage available to CP under the Pickens' IDS policy.  *Id.* ¶ 23.

On May 1, 2015, the Court granted Progressive Max Insurance Company's ("Progressive") unopposed motion to intervene as a party plaintiff.  Dkt. 14.  On May 13, 2015, Progressive filed an intervenor complaint, seeking a declaratory judgment regarding the amount of UIM coverage available to CP under the Pickens' Progressive policy.  Dkt. 16.

On August 27, 2015, IDS and Progressive each filed motions for summary judgment.  Dkt. 29, 30.  On September 18, 2015, the Pickens responded.  Dkt. 36.  On September 25, 2015, IDS replied.  Dkt. 39.

On August 28, 2015, the Pickens filed a cross-motion for summary judgment.  Dkt. 33.  On September 21, 2015, IDS and Progressive filed their respective responses.  Dkts. 37, 38.

## II. FACTUAL BACKGROUND

The parties have stipulated to the following facts for the purposes of summary judgment.  Dkt. 28.

**A.     August 31, 2014**

On August 31, 2014, Chancellor Pruett ("Pruett") drove his Mazda west on NE 99th Street in Vancouver, Washington.  *Id.* ¶¶ 3.1–3.2.  There are two westbound lanes on NE 99th Street, and the posted speed limit is 35 miles per hour.  *Id.* ¶ 3.2.  While driving west on NE 99th Street, Pruett passed several cars by cutting back and forth between lanes at a high rate of speed.  *Id.* ¶¶ 3.2–3.5.

1  Meanwhile, Derek Gear ("Gear") was driving his BMW east on NE 99th Street.

2  *Id.* ¶ 3.6.  Gear intended to turn left across the westbound lanes of NE 99th Street into an

3  apartment complex.  *Id.*  Gear slowed to turn left, and looked for oncoming traffic.  *Id.*

4  He observed some cars approaching from the east, but thought those cars were far enough

5  away that he could safely turn left.  *Id.*  As Gear turned his BMW left, his car was struck

6  by Pruett's Mazda.  *Id.*  Gear told police that he did not see Pruett's Mazda before his left

7  turn.  *Id.*

8  The Mazda and BMW collided in the westbound curb lane of NE 99th Street.  *Id.*

9  ¶ 3.7.  The Mazda was going somewhere between 64 and 88 miles per hour at impact.  *Id.*

10  The left front of the Mazda struck the right front of the BMW in a glancing hit.  *Id.*  After

11  impact, the Mazda travelled north and west onto the sidewalk on the north side of NE

12  99th Street.  *Id.*  The right side of the Mazda struck a brick wall on the north side of the

13  sidewalk.  *Id.*  The Mazda then traveled west on the sidewalk.  *Id.*

14  At the time, CP was walking west on the sidewalk.  *Id.* ¶ 3.8.  The Mazda struck

15  CP on the sidewalk, approximately 32 to 55 feet from where the Mazda collided with the

16  BMW.  *Id.*  Between .3 and .5 of a second elapsed from when the Mazda hit the BMW to

17  when the Mazda hit CP.  *Id.* ¶ 3.9.

18  After hitting CP, the Mazda veered off the sidewalk and back into the westbound

19  lane of NE 99th Street and came to rest.  *Id.* ¶ 3.10.  The Mazda stopped approximately

20  170 feet from the point of first impact with the BMW.  *Id.*  The BMW stopped in the

21  westbound curb lane of NE 99th Street after colliding with the Mazda.  *Id.*

22

CP's body came to rest about 140 feet from the point of initial impact with the Mazda. *Id.* ¶ 3.11.  CP suffered extensive and severe injuries, including a skull fracture, subdural hematoma, and traumatic brain injury. *Id.* ¶ 5.1.  CP will require a life-care plan. *Id.*

Both Pruett and Gear were at fault in causing the collision between the two cars, which resulted in the Mazda hitting CP. *Id.* ¶ 4.1.  CP was without fault. *Id.* ¶ 4.2.

**B.     Insurance Policies**

Pruett and Gear each had automobile liability insurance policies. *Id.* ¶¶ 6.1–6.2. The combined limits of Pruett and Greer's insurance policies are woefully insufficient to fully compensate CP for his injuries. *Id.* ¶ 6.3.

At the time of the accident, the Pickens had an automobile insurance policy with IDS. *Id.* ¶ 6.4.  The IDS policy provides UIM coverage for "[b]odily injury sustained by [an insured] person and caused by an accident."  Dkt. 31 at 8.  The IDS policy limits UIM coverage to $250,000 "for bodily injury . . . to one person in one accident."  Dkt. 31 at 2, 18.  This limit applies "regardless of the number of vehicles described in the declarations, insured persons, claims, claimants, policies, premiums paid or vehicles involved in the accident."  Dkt. 31 at 18.  The IDS policy does not define the term "accident."

In addition to the IDS policy, Craig Pickens had a motorcycle insurance policy with Progressive.  Dkt. 28 ¶ 6.7.  The Progressive policy provides UIM coverage for bodily injury "1. sustained by an insured person; 2. caused by an accident; and 3. arising out of the ownership, maintenance, or use of an underinsured motor vehicle."  Dkt. 32 at 15.  The Progressive policy limits UIM coverage to $25,000 for "bodily injury to one

person resulting from any one accident." Dkt. 32 at 2, 18. This limit applies regardless

of the number of vehicles involved in the accident. Dkt. 32 at 18. The Progressive policy

defines "accident" as "an occurrence that is unexpected and unintended from the stand

point of the insured person." *Id.* at 15.

The IDS and Progressive policies include "other insurance" provisions. *Id.* ¶¶ 6.6,

6.9. These provisions provide that if another insurance policy "providing similar

insurance appl[ies] to the same accident, the maximum limit of liability under all the

policies shall be the highest applicable limit of liability under any one policy." Dkt. 31 at

18; Dkt. 32 at 19.

Based on the "other insurance" provisions in the IDS and Progressive policies, the

parties agree that CP is entitled to recover a total of $250,000 per accident. Thus far, IDS

and Progressive have collectively tendered $250,000 in UIM coverage to CP. Dkt. 28

¶¶ 6.10–6.11. CP seeks an additional $250,000 in UIM coverage from IDS and

Progressive. *Id.*¶¶ 6.12–6.13. IDS and Progressive have declined to offer CP a second

UIM limit. *Id.*

### III. DISCUSSION

The parties cross-move for summary judgment on the number of UIM limits

available to CP under the IDS and Progressive policies. Dkts. 29, 30, 33.

**A.      Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

1  The moving party is entitled to judgment as a matter of law when the nonmoving party

2  fails to make a sufficient showing on an essential element of a claim in the case on which

3  the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317,

4  323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole,

5  could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec.*

6  *Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986) (nonmoving party must

7  present specific, significant probative evidence, not simply "some metaphysical doubt").

8  *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists

9  if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

10  jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477

11  U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

12  626, 630 (9th Cir. 1987).

13  The determination of the existence of a material fact is often a close question. The

14  Court must consider the substantive evidentiary burden that the nonmoving party must

15  meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477

16  U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual

17  issues of controversy in favor of the nonmoving party only when the facts specifically

18  attested by that party contradict facts specifically attested by the moving party. The

19  nonmoving party may not merely state that it will discredit the moving party's evidence

20  at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W.*

21  *Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory,

22

1   nonspecific statements in affidavits are not sufficient, and missing facts will not be

2   presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888–89 (1990).

3   **B.    UIM Coverage**

4        The issue before the Court is whether CP is entitled to recover one per accident

5   UIM limit or two per accident UIM limits for the injuries he suffered on August 31, 2014.

6   IDS and Progressive argue that CP is entitled to only one UIM limit because CP was

7   injured in one accident. Dkts. 29, 30. The Pickens argue that CP is entitled to a second

8   UIM limit because CP was injured as a result of two accidents. Dkt. 33.

9        To resolve this issue, the Court first turns to the language in the IDS and

10  Progressive policies. In Washington, the interpretation of insurance policies is a question

11  of law. *Moeller v. Farmers Ins. Co. of Wash.*, 173 Wn.2d 264, 271 (2011). Washington

12  courts construe insurance policies as a whole, giving force and effect to each clause in the

13  policy. *Am. Star Ins. Co. v. Grice*, 121 Wn.2d 869, 874 (1993), *opinion supplemented by*

14  123 Wn.2d 131 (1994). "If the language in an insurance contract is clear and

15  unambiguous, the court must enforce it as written and may not modify the contract or

16  create ambiguity where none exists." *Transcon. Ins. Co. v. Wash. Pub. Utils. Dists. Util.*

17  *Sys.*, 111 Wn.2d 452, 456 (1988). If the policy language is fairly susceptible to two

18  different reasonable interpretations, it is ambiguous, and the Court may attempt to discern

19  the parties' intent by examining extrinsic evidence. *Id.* at 456–57. Any undefined terms

20  should be "given their ordinary and common meaning, not their legal, technical

21  meaning." *Moeller*, 172 Wn.2d at 272.

22

1    The IDS and Progressive policies both provide UIM coverage for bodily injury

2    "caused by an accident."[1] Dkt. 31 at 8; Dkt. 32 at 15.  The Progressive policy defines

3    "accident" as "an occurrence that is unexpected and unintended from the stand point of

4    the insured person."  Dkt. 32 at 15.  The IDS policy does not define the term "accident."

5    When undefined in an insurance policy, Washington courts define the term "accident" as

6    "an unusual, unexpected, and unforeseen happening."  *Grange Ins. Co. v. Brosseau*, 113

7    Wn.2d 91, 95 (1989).  Thus, under both policies, an "accident" is an unexpected and

8    unforeseen occurrence or happening from the standpoint of the insured, who would be CP

9    in this case.

10    The IDS and Progressive policies also include provisions that limit the amount of

11    UIM coverage that an insured may recover.  Dkt. 31 at 2, 18; Dkt. 32 at 2, 18.  The IDS

12    policy limits UIM coverage to $250,000 "for bodily injury . . . to one person in one

13    accident."  Dkt. 31 at 2, 18.  The Progressive policy limits UIM coverage to $25,000 for

14    "bodily injury to one person resulting from any one accident."[2] Dkt. 32 at 2, 18.  These

15    coverage limits apply "regardless of the number of vehicles described in the declarations,

16    insured persons, claims, claimants, policies, premiums paid or vehicles involved in the

17    accident."  Dkt. 31 at 18; *see also* Dkt. 32 at 18 ("The limit of liability . . . for

18    Underinsured Motorist Coverage is the most we will pay regardless of the number

19    _____

20    [1] For the purposes of summary judgment, the parties do not dispute that the other
requirements for UIM coverage are satisfied.

21    [2] Although the language between the two Limits of Liability for UIM coverage
provisions is not identical, the Pickens state that "the Progressive policy provisions do not

22    meaningfully differ from the IDS policy."  Dkt. 33 at 10.

1    of . . . vehicles involved in the accident."). Accordingly, the number of vehicles involved

2    in an accident does not increase the amount of UIM coverage available to CP under the

3    IDS and Progressive policies. None of the parties contend that the relevant language in

4    the IDS and Progressive policies is ambiguous.

5        Turning to the facts, two collisions occurred on August 31, 2014: one between the

6    Mazda and BMW, and one between the Mazda and CP. After colliding with the BMW in

7    the curb lane, the Mazda travelled onto the sidewalk and hit CP. CP suffered extensive

8    injuries from the Mazda's impact. The BMW did not hit CP at any point. The parties

9    agree that the second collision between the Mazda and CP constitutes an "accident" for

10   the purposes of UIM coverage. The parties disagree as to whether the first collision

11   between the Mazda and BMW also constitutes an "accident."

12       Under the circumstances of this case, the Court finds that there was one "accident"

13   for the purposes of UIM coverage. To determine the number of "accidents," the Court

14   must look at the events on August 31, 2014 from the perspective of CP. Dkt. 32 at 15;

15   *Grange*, 113 Wn.2d at 95. On August 31, 2014, CP was struck once by the Mazda.

16   From CP's standpoint, he was injured in one unexpected and very unfortunate

17   occurrence. Although the Mazda previously collided with the BMW, this fact does not

18   transform the Mazda's single collision with CP into two "accidents" for the purposes of

19   CP's UIM coverage. Indeed, both policies provide that the number of vehicles involved

20   in the accident does not increase the amount of UIM coverage available to CP.

21       The Pickens nevertheless rely on *Greengo v. Public Employee's Mutual Insurance*

22   *Co.*, 135 Wn.2d 799 (1998), to argue that the collision between the Mazda and BMW

1   constitutes a second "accident" for UIM coverage purposes.  Dkt. 33 at 10–16.  In

2   *Greengo*, the insured was involved in two collisions.  135 Wn.3d at 803.  The car the

3   insured was in rear-ended the car in front of it, and then was rear-ended by the car behind

4   it.  *Id.*  The insured sought UIM coverage under her insurance policy, which limited UIM

5   coverage to $100,000 per "accident."  *Id.*  The insured argued she "was involved in two

6   'accidents' for purposes of [UIM coverage] because two drivers proximately caused her

7   injuries in two collisions."  *Id.* at 813.

8          To determine whether there was one "accident" or two, the *Greengo* court

9   analyzed the proximate cause of each collision.  *Id.* at 813–16.  In doing so, the court

10  explained:

11          We have previously considered situations involving two or more
            collisions to determine whether there were two or more "accidents" for
12          insurance purposes.  Where there were two collisions, we look to see if
            each has its own proximate cause.  If so, then there are two
13          accidents. . . . Under our approach if each accident, collision, or injury has
            its own proximate cause then each will be deemed a separate "accident" for
14          insurance policy purposes even if the two accidents occurred coincident, or
            nearly coincident, in time.
15
    *Id.* at 813–14.  Based on this language, the Pickens contend that there were two
16
    "accidents" in this case because Pruett and Grear's negligence caused two collisions that
17
    resulted in CP's injuries.  Dkt. 33 at 10–16; Dkt. 36 at 3.
18
           The *Greengo* court, however, was addressing a situation in which the insured was
19
    personally involved in more than one collision.  The court's discussion of the facts makes
20
    clear that it applied a proximate cause analysis because the insured was involved in two
21
    collisions:
22

1         The question, therefore, is whether the two collisions had separate
2   proximate causes.  Ms. Greengo references the police report which states
    that Ferulli first crashed into a slowing car in front and then Hampshire
3   subsequently slammed into Ferulli.  The report also states both Ferulli and
    Hampshire were following too closely.  If the events occurred as described
4   in this police report, both Ferulli and Hampshire were separately negligent
    and each of the two collisions has its own separate proximate cause.  Under
5   *Transcontinental* the two collisions would then constitute two separate
    "accidents."

6   *Id.* at 815.  *Greengo* does not establish that two per accident UIM limits apply when an

7   insured is involved in one collision that has two proximate causes.  Rather, *Greengo*

8   establishes that when an insured is involved in two collisions, there are two "accidents"

9   for purposes of UIM coverage if each collision has a separate proximate cause.  *See id.* at

10  813–15.

11        The cases relied on by the *Greengo* court support this conclusion.  For example, in

12  *Truck Insurance Exchange v. Rohd*, 49 Wn.2d 465, 467 (1965), the insured was involved

13  in three collisions and sought multiple per accident liability coverage.  In analyzing how

14  many "accidents" occurred for insurance purposes, the Washington Supreme Court

15  focused on the proximate cause of each collision.  *Id.* at 471–72.  The *Rohd* court

16  concluded that there was one "accident" because the three collisions resulted from a

17  single proximate cause.  *Id.* at 472.  In *Transcontinental*, the insured was a defendant in

18  multiple suits alleging multiple injuries following a municipal bond default.  111 Wn.2d

19  at 455.  In concluding the matter potentially involved more than one "occurrence" or

20  "accident" for insurance purposes, the Washington Supreme Court noted that the

21  bondholders' allegations against the insured involved "injuries flowing from multiple,

22  distinct events."  *Id.* at 466.

1    The two out-of-state decisions cited by the *Greengo* court also involved insureds

2 who were involved in more than one collision.  *See Liberty Mut. Ins. Co. v. Rawls*, 404

3 F.2d 880, 880–81 (5th Cir. 1968) (finding two separate "accidents" where the insured

4 was involved in two collisions); *Illinois Nat'l Ins. Co. v. Szczepkowicz*, 542 N.E.2d 90, 93

5 (Ill. App. Ct. 1989) (finding two separate "accidents" where the insured was involved in

6 two collisions).

7    In contrast to these cases, CP was not involved in multiple collisions.  Instead, CP

8 was involved in only one of the two collisions that occurred on August 31, 2014.  Even if

9 the Court applied a proximate cause analysis in this case, the undisputed facts establish

10 that each collision had the same proximate cause—the combined negligence of Pruett and

11 Gear.[3]  Thus, under a proximate cause analysis, there is still one "accident" for purposes

12 of UIM coverage.

13    Because there was one "accident" for the purposes of CP's UIM coverage, the

14 Court concludes that CP is entitled to one per accident UIM limit under the IDS and

15 Progressive policies.  The Court therefore grants IDS's and Progressive's motions and

16 denies the Pickens' motion.

17 **C.    Remaining Issues**

18    The Court is under the impression that this order closes the case.  IDS and

19 Progressive have collectively tendered $250,000 in UIM coverage to CP.  Dkt. 28

20 ¶¶ 6.10–6.11.  In its complaint, IDS also seeks a declaration that it fully satisfied its

21 _____

22    [3] None of the parties argue that Pruett's handling of the Mazda in response to the first collision was a superseding and intervening event.

obligations with regard to PIP coverage.  Comp. ¶¶ 22–23.  The Pickens, however, "have not and are not asserting that any further PIP benefits are owed by or due from either insurer, IDS or Progressive."  Dkt. 28 ¶ 6.17.  If there are remaining issues to be addressed by the Court, the parties should file a joint status report identifying those issues by November 6, 2015.  Otherwise, the parties should ask the Court to enter judgment pursuant to this order.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Progressive's motion for summary judgment (Dkt. 29) is **GRANTED**, IDS's motion for summary judgment (Dkt. 30) is **GRANTED**, and the Pickens' motion for summary judgment (Dkt. 33) is **DENIED**.

Dated this 20th day of October, 2015.

BENJAMIN H. SETTLE
United States District Judge